UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

OTIS LEE COLE #232716,

    Plaintiff,

v.

MICHIGAN DEPARTMENT
OF CORRECTIONS, et al.,

    Defendants.
_____/

Case No.   2:18-cv-00159

Hon.  Gordon J. Quist
U.S. District Judge

## REPORT AND RECOMMENDATION

**I.  Introduction**

This Report and Recommendation (R&R) addresses the summary judgment motion filed by Defendants. (ECF No. 62.)

State prisoner Plaintiff Otis Lee Cole filed this civil rights action pursuant to 42 U.S.C. § 1983 on September 25, 2018. Cole filed a verified amended complaint on December 27, 2019, alleging violations of his right to practice his religious beliefs and retaliation while he was incarcerated at the Marquette Branch Prison (MBP). (ECF No. 32.) Cole says that he faced significant difficulties in attempting to participate in Moorish Science Temple (MST) services.

Cole's amended complaint alleged three claims against Defendants Chaplin Prisk, Assistant Residential Unit Supervisor (ARUS) Govern, and Residential Unit Manager (RUM) Viitala. Cole asserted that Defendants violated his First Amendment right to freely practice his religion by denying him the opportunity to

attend MST services. (ECF No. 32, PageID.123, (Claim One).) Cole also asserted that Defendants violated his under the equal protection clause of the Fourteenth Amendment. (*Id.*, (Claim Two.) And Cole asserted that Chaplain Prisk retaliated against him for filing grievances and complaint by refusing to allow him to attend MST services, in violation of the First Amendment. (*Id.*, PageID.123-124, (Claim Three).)

On September 29, 2020, the Court dismissed Cole's official capacity claims and his equal protection claims (Claim Two). (ECF No. 54.) Defendants' motion for summary judgment argues that Cole never made proper requests to attend MST services and that Defendants did not violate his right to exercise his religious beliefs. Cole has alleged in his verified amended complaint that he made numerous requests to attend MST services that were denied or ignored by Defendants. Cole asserts that his requests were proper and did not violate any written or communicated policy. Cole has presented facts, that if true, could establish that his First Amendment rights to practice his religion were violated and that he was retaliated against due to filing grievances. Thus, Cole has presented evidence establishing a genuine issue of fact as to his remaining claims.

It is respectfully recommended that the Court deny Defendants' motion for summary judgment because genuine issues of material fact remain.

**II. Additional Factual Allegations**

In his amended complaint (ECF No. 32, PageID.118), Cole says that he is a "sincere adherent to the Muslim faith, and an active member of the Moorish Science

2

Temple." (ECF No. 32, Page ID.119.) He says that attending religious service is a "central component to the practice" of his religion. (*Id.*) Cole says that in December 2017, he requested a Declaration of Religious Preference form from ARUS Govern to participate in MST services. (*Id.*)

Govern allegedly denied Cole's request for this form and stated that Cole would not be able to attend religious services due to Cole's Security Threat Group (STG) status, and because Cole "'gets into to [sic] much trouble.'" (*Id.*) Cole says that he was unaware of any MDOC policy preventing him from attending MST services and filed a grievance that complained about Govern's decision. (*Id.*, PageID.120.)

Cole says that he subsequently obtained a copy of a Declaration of Religious Preference form. He says that, on December 15, 2017, he completed this form and submitted it to Govern's office in-box. (*Id.*, PageID.121).

Cole says that between December 2017 and February 2018, he sent no less than seven "kites" (an internal form of communication between prisoners and staff members) to Defendants requesting access to religious services. (*Id.*) On February 25, 2018, Prisk provided Cole a second Declaration of Religious Preference form. (*Id.*) Cole completed it and submitted it to Viitala. (*Id.*)

On April 15, 2018, after four additional kites went unanswered, Cole filed a second Prisoner/Parole Grievance that named all three of the defendants for "constructively denying him access to group religious services by failing to process his religious preference forms, and by refusing to place him on the weekly call-out for Moorish Science Temple of America religious services." (ECF No. 32, PageID.121.)

3

At Steps I and II, Prisk responded by informing Cole that he had not been allowed to attend religious services because Cole "failed to submit a specific request to" Prisk. (*Id.*) Cole alleges that he submitted at least five kites to Prisk by the time of Prisk's response. (*Id.*)

Cole says he wrote four more kites to Prisk that requested access to religious services. (ECF No. 32, PageID.122.) The latter two kites were hand-delivered to Prisk by different prisoners. (*Id.*) Cole says that Prisk read each kite and stated that he would not place Cole on the religious call-out list until Cole stopped writing grievances. (*Id.*) Cole, however, wrote Prisk two more kites to inform him that Cole would not write any more kites and that he "just wanted" to attend religious service. (*Id.*) Those kites went unanswered. (*Id.*)

Subsequently, Cole filed another grievance against Prisk for retaliating against Cole. (ECF No. 32, PageID.122-123.) The grievance is based on Prisk's alleged intentional failure to include Cole on the religious call-out list. (*Id.*)

When the dispute entered the Western District Court's Early Mediation program, Defendants allowed Cole to attend religious ceremonies. (ECF No. 32, PageID.122-123.)

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether

summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

### IV. Free Exercise of Religion – Religious Services (Claim One)

Defendants first argue that Cole cannot produce evidence showing a violation of his religious rights under the First Amendment. While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish a violation of his First Amendment rights, Cole must show that: (1) the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

5

Prison officials may impinge on a prisoner's constitutional right to exercise First Amendment religious beliefs if their actions are "reasonably related to legitimate penological interests." *Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

    1.     does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

    2.     are there alternative means of exercising the right that remain open to prison inmates;

    3.     the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

    4.     whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

Failure to satisfy the first factor renders the regulation or action infirm, without regard to the remaining three factors. *Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-90) ("a regulation cannot be sustained where the logical

connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational").

If the first factor is satisfied, the remaining three factors are considered and balanced together; however, they are "not necessarily weighed evenly," but instead represent "guidelines" by which the court can assess whether the policy or action at issue is reasonably related to a legitimate penological interest. *Flagner*, 241 F.3d at 484 (citations omitted). It should further be noted that the *Turner* standard is "not a 'least restrictive alternative' test" requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint" *Id.* Instead, the issue is simply whether the policy or action at issue is reasonably related to a legitimate penological interest. *Id.* "However, 'if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.'" *Id.* at 484 (quoting *Turner*, 482 U.S. at 91.) Defendants do not challenge Cole's right to practice his religion by attending MST services. Defendants argue that Cole failed to make a proper request for religious services in accordance with prison policy and procedures.

Chaplin Prisk, ARUS Govern, and RUM Viitala argue that Cole never requested to attend MST services between December of 2017 and February of 2018. For a prisoner to attend religious services of a particular religion, the prisoner must declare their religious preference by using a Declaration of Religious Preference form

7

(CSJ-177).  (ECF No. 63-2, PageID.285.)  A prisoner then could send a form request (63-3, PageID.287) or kite to Chaplain Prisk to attend group religious services for their declared religion (ECF No.63-5, PageID.295 (Memorandum dated June14, 2017).)  Chaplain Prisk's memorandum, which was posted in the prison housing units, explained that submitting a CSJ-177 was not a request to attend religious services.  The memorandum stated in part:

> 2. Prisoners who wish to attend chapel must send an individual kite or service request form to the chaplain.  Requests must include the prisoner's name, number, lock and the service desired.  Requests with the names of more than one prisoner will not be accepted.
> 3. Prisoners may only attend the services of their designated religion.
> 4. Change of Religion forms, (CSJ-177) are available in the housing unit and must be verified as coming from the named individual by a RUM or ARUS signature.  *The CSJ-177 is not a request to attend services.*

(*Id.*)

> MBP Operating Procedure 05.03.150 provides in part:

> Each prisoner shall be allowed to identify his religious affiliation but will not be recognized as belonging to, or allowed to participate in the services or activities of more than one religion at any given time.  Prisoners may change their religious affiliation no more than twice in a 12-month period and must provide written notice of the change to the Institutional Chaplain.  A Declaration of Religious Preference form (CSJ-177) shall be used to identify and change religious affiliation.  The form shall not be retained in the prisoner's Central Office, Record Office, or Counselor file, unless requested in writing by the prisoner.  The Warden shall ensure that the prisoner's religious affiliation (as identified on the Department's Declaration of Religious Preference form) is entered on the Department's computerized database (e.g. OMNI) within five days of receipt of the form by the Chaplain.  Receipt of a Declaration of Religious Preference form shall not be sufficient to request attendance at a particular religious service.  Group religious services and activities shall be offered only for religious groups recognized by the Department.  A prisoner shall be permitted to attend only the group religious services and activities offered for the religion he has designated in writing as his religious affiliation.

(ECF No. 63-4.)

Defendants assert that Cole only submitted a CSJ-177 form to change his religious preference to MST and he mistakenly believed that he could attend religious services once the form was accepted.  Defendants point out that Cole's grievance MBP 18-04-00567-20Z, dated April 15, 2018, confirms this misunderstanding:

8

> I am grieving the MBP Chaplain, RUM Viitala, and ARUS Govern for constructively denying me access to group religious services at this facility. Current MBP procedure requires that in order for a prisoner to attend religious services that prisoner must first submit a written request to the facility Chaplain for a Declaration of Religious Preference Form. Once the prisoner has filled out that form he must submit it to the block RUM or ARUS for approval and signature. The form is then forwarded to the Chaplain and the prisoner is placed on the call-out for the religious services indicated on the form.
>
> I have been requesting the opportunity to attend Moorish Science Temple of America services since I arrived at this facility approximately nine months ago. Initially I was denied the requisite Religious Preference form by the Chaplain. After finally receiving the form and submitting it, (first one to the RUM, and when I was still not placed on the call-out, a second one to the ARUS), I have still not been placed on the call-out for services. I believe that I am being discriminated against and being denied the opportunity to attend religious services at this facility because of my Muslim Faith. This constructive denial is a violation of MDOC policy Directive 05.03.150, Religious Beliefs and Practices of Prisoners; the First Amendment to the U.S. Constitution, Freedom of Religion; section 2 of the Civil Rights of Institutionalized Persons Act 42 U.S.C.A. § 1997; and the Religious Land Use and Institutionalized Persons Act 42 U.S.C.A. § 2000cc-1 2002.
>
> I respectfully request that I be placed on the religious call-out immediately. Failure to do so will result in civil litigation in Federal court.
>
> _Mr. Co— El_
> Grievant's Signature

(ECF No. 63, PageID.264.)

Defendants assert that Cole first submitted his CSJ-177 form on February 20, 2018, and never submitted a kite or request to attend MST services prior to that date. (ECF No. 63-9, PageID.318.) Cole's verified amended complaint states that he was initially denied a CSJ-177 form by ARUS Govern because he got into too much trouble. (ECF No. 32, PageID.118.) Cole stated that he was able to obtain and submit a completed CSJ-177 form by placing it in ARUS Govern's office in-box. (*Id.*) Additionally, Cole stated that between December of 2017 and February of 2018, he sent at least seven kites to Defendants requesting to attend MST religious services. (*Id.*) In the opinion of the undersigned, Cole raised a genuine issue of fact regarding whether he requested or submitted a form to change his religion that was ignored in December of 2017, and whether he submitted kites to attend MST religious services that were denied or ignored by Defendants between December of 2017 and February of 2018.

RUM Viitala and ARUS Govern might be arguing that even if Cole had submitted his CSJ-177 form and requests to attend MST services directly to them,

9

policy required Cole to send the requests to Chaplain Prisk.[1] (ECF No. 63, PageID.271.) ARUS Govern also argues that his alleged involvement could not rise to a Constitutional violation because his multiple alleged denials of Cole's right to exercise his religious beliefs were isolated occurrences. (*Id.*) Cole argues that ARUS Govern intentionally denied him the ability to exercise his religious rights on more than one occasion. Cole asserts that he thought ARUS Govern forwarded his initial CSJ-177 to Chaplain Prisk and the multiple kites that he sent to ARUS Govern and RUM Viitala went unanswered.[2] (ECF No. 67, PageID.361.) Although Cole's arguments that ARUS Govern and RUM Viitala violated his right to practice his religious beliefs may be based upon thin evidence, Cole has presented enough in his verified complaint to create a genuine issue of fact to overcome ARUS Govern and RUM Viitala's denials that they violated Cole's First Amendment rights.

## V. Retaliation (Claim Three)

Cole asserts that Chaplain Prisk retaliated against him by denying or ignoring his kites to attend MST services in June of 2018, after his religious declaration was finally approved. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation

---

[1] If this is Defendants' argument it is not well developed, nor does it appear that the policy specifies the manner in which the forms or kites are to be sent to Chaplain Prisk. ARUS Govern attests that kites must be place in the general mailbox in the housing unit, which will be delivered to the mailroom, and then forwarded to the appropriate staff. (ECF No. 63-8, PageID.314.)

[2] Cole alleges that his kites went unanswered even after his CSJ-177 form was accepted in February of 2018. (ECF No. 67, PageID.363.)

claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.*

After a prisoner establishes the first two elements, the prisoner must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

The Sixth Circuit has also employed a burden-shifting approach with respect to the causation element:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X,* 175 F.3d at 399.

Although, Chaplain Prisk concedes that Cole engaged in protected conduct by filing grievances, Chaplain Prisk argues that he did not retaliate against Cole. Chaplain Prisk argues that he did not approve Cole to attend MST services for one reason only, and that was because Cole failed to send him a proper request to attend MST services. Prisk attests that he has a standard policy of not accepting hand delivered kites, and if other prisoners delivered Cole's kites, he would not have acted on them. (ECF No. 63-6, PageID.300, (affidavit of Chaplain Prisk).) Chaplain

Prisk denies that he received any requests from Cole to attend MST services and denies that he made any comments as alleged – that Cole was the "grievance guy" or "complainer".  (*Id*.)

Cole argues that Chaplain Prisk's memorandum does not state how prisoners were supposed to send him kites to attend religious services.  (ECF No. 67, PageID.366.)  The memorandum simply directs prisoners to send kites or service request forms to the chaplain.  (ECF No.63-5, PageID.295.)  Cole's verified amended complaint states that he sent several kites (10 kites total and 5 to Chaplain Prisk) for religious services to the Chaplain that were denied and ignored (ECF No. 32, PageID.121).  Cole points out that it is undisputed that by April 16, 2018, based upon Chaplain Prisk's response to Cole's grievance, Chaplain Prisk knew that Cole wanted to attend MST services.  (ECF No. 32, PageID.121-122.)  Then in June of 2018, because Cole's previous kites were being ignored or rejected, he had two prisoners deliver his kites to Chaplain Prisk with requests for MST services.  (*Id*., PageID.122.)  It is at this time that Chaplain Prisk allegedly made comments about Cole being the "grievance guy" or "complainer".  (*Id*.)  Still, Cole says that he sent Chaplain Prisk two more kites in a last-ditch effort to attend MST services, and clearly indicated in those kites that he would not file anymore grievances and that he just wanted to attend MST religious services.  (*Id*.)  Cole says that these kites were never answered.  (*Id*.)

In the opinion of the undersigned, Cole raises issues of fact as to whether he submitted kites to Chaplain Prisk for MST services that were intentionally ignored

due to Cole's prior grievances. Cole has established facts that if proven true, show that he engaged in protected conduct by submitting grievances, he was denied attendance at MST religious services (adverse action), and that denial was because he had filed prior grievances (causation).

The undersigned recommends that the Court find that Chaplain Prisk's assertion that he never received any of Cole's kites and his denial of Cole's allegations fail to carry his burden of establishing a lack of a genuine issue of material fact.[3]

## VI. Qualified Immunity

As an alternative argument, Defendants move for dismissal on qualified immunity grounds. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957

---

[3] Chaplain Prisk attests that the first time he received a request from Cole to attend MST services was in March of 2019, when he first scheduled Cole to attend services. (ECF No. 63-6, PageID.299.)

13

(6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second step. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must

14

> be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023 (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix, supra*, at 309 (quoting *Anderson, supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*D.C. v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

In the opinion of the undersigned, where there are two plausible views of the facts and a genuine issue of material fact exists on the record, the Court is prohibited from entering summary judgment for either party.

### VII. Recommendation

It is respectfully recommended that the Court deny Defendants' motion for summary judgment.

15

NOTICE TO PARTIES: Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b). Failure to file timely objections constitutes a waiver of any further right to appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

Dated: February 3, 2022                                  /s/ *Maarten Vermaat*
                                                                            MAARTEN VERMAAT
                                                                            U.S. MAGISTRATE JUDGE